# SPEIGHT v. ROCKY MOUNTAIN BELL TELEPHONE COMPANY.

No. 2031.   Decided November 8, 1909.   On Petition for Rehearing
March 22, 1910 (107 Pac. 742).

1. MASTER AND SERVANT—VARIANCE BETWEEN ALLEGATIONS AND
PROOF. In an action for injuries from electricity, there was no
variance between allegations that at the time of injury, without
plaintiff's fault, his left leg touched the wire at a point of de-
fective insulation, and that, by reason of the defective insulation,
an electric current of 4400 volts passed from the wire through
his body, and proof that electricity could jump or arc three or
four inches from the wire, and that plaintiff received his first
shock before his body came in actual contact with the wire.
(Page 493.)

2. APPEAL AND ERROR—TRIVIAL ERROR—VARIANCE. Variance, if any,
was immaterial, one of the grounds for recovery being defective
insulation of the wire of which defendant had notice, it being
alleged that the insulation at the place of injury was defective,
so that the electricity could pass to the bodies of persons coming
in contact with the wire, and that defendant had knowledge
of the defective condition, and negligently permitted the wire
to be attached to its pole, and negligently failed to warn plaintiff
of the danger; Comp. Laws, 1907, section 3001, providing that
no variance between allegations in a pleading and the proof
will be deemed material unless it has actually misled the ad-
verse party to his prejudice in maintaining his action or de-
fense upon the merits.1   (Page 493.)

3. MASTER AND SERVANT — SAFE PLACE TO WORK — DUTY OF MAS-
TER. It is the duty of the master to furnish a servant with a
reasonably safe place to perform the work required of him under
his contract of employment.   (Page 494.)

4. MASTER AND SERVANT—ASSUMPTION OF RISK. A servant entering
the employ of a telephone company to work, on its poles and
wires assumes the minor risks incident to the employment, and
such dangers as are obvious and apparent, but not such extra
risks as might arise from the master's failure to use ordinary
care to keep properly insulated wires, carrying heavy currents
of electricity, strung upon its poles, where the servant is to
work, unless such extra dangers are pointed out to the servant.
(Page 495.)

1 Culmer v. Clift, 14 Utah 286, 47 Pac. 85; Holman v. Pleasant
Grove City, 8 Utah 78, 30 Pac. 72.

5. MASTER AND SERVANT—WARNING OF EXTRA DANGERS. A clause in a telephone company's "notice and rules" that electric light and power wires, whether insulated or not, may be dangerous did not exonerate the company from liability from injury to an employee from a defectively insulated heavy voltage wire of an electric company strung on a telephone pole; the fact that the wire was insulated being in effect notice to the servant that he might rely upon whatever safety and protection the insulation of wires secures to linemen working on poles on which such wires are strung. (Page 496.)

6. MASTER AND SERVANT—METHODS OF WORK—QUESTION OF FACT. Whether an injured servant in performing his work adopted the more dangerous method of two or more ways to do the work is a question of fact. (Page 498.)

ON PETITION FOR REHEARING.

7. MASTER AND SERVANT—INJURIES TO SERVANT—REFUSAL OF REQUEST. In an injury action by a servant, where no claim was made that plaintiff was not chargeable with knowledge of "notice and rules" of the master, signed by plaintiff and introduced in evidence, his contention being that the contents of the writing did not constitute warning of the particular defect causing the injury, it was not error to refuse a charge that the servant was bound to read the instructions and warning which were delivered to him by the master, and was chargeable with knowledge of all contained therein pertaining to the action, though he had not read it, especially where the court charged that the servant, when he signed the writing, had warning of the matters therein set out, and that the jury should consider it for that purpose, and that if plaintiff had been given reasonable notice so that a reasonably prudent person would have known it, he would be deemed to have constructive notice. (Page 500.)

8. TRIAL—DUTY TO INSTRUCT. While parties are entitled to charges on the law applicable to the case, and it is the court's duty, when seasonably requested in writing by either party, to instruct upon any issue, the court need not follow the exact language of the request; but, if it clearly and correctly states the law in its general charge applicable to the points and issues covered by the requests, it is sufficient. (Page 501.)

APPEAL from District Court, Third District; *Hon. T. D. Lewis* Judge.

2 Spiking v. Consol. Ry. & Power Co., 33 Utah 313, 93 Pac. 838; Hickey v. Railroad, 29 Utah 394, 82 Pac. 29.

Action by George Harold Speight against the Rocky Mountain Bell Telephone Company, and another.

Judgment for plaintiff. The Telephone company appealed.

AFFIRMED.

*Howat & Macmillan* and *George Y. Wallace, Jr.,* for appellant.

*W. R. Hutchinson* and *A. R. Barnes* for respondent.

### APPELLANT'S POINTS.

The rule of law as to the assumption of risks by servants who are minors is stated in the following cases, where minors suffered injuries in the course of their employment: (*Hickly v. Taafe,* 105 . Y. 26; *Crown v. Orr* [N. Y.], 35 N. E. 648; *Probet v. Phipps* [Mass.], 21 N. E. 370; *Pratt v. Prouty* [Mass.], 26 N. E. 1002; *Downey v. Sawyer* [Mass.], 32 N. E. 654; *O'Keefe v. Thorn* [Pa.], 16 At. 737; *Greenway v. Conroy* [Pa.], 28 At. 692; *McGinnis v. Canada Southern Bridge Co.* [Mich.], 13 N. W. 819; *Van Wyck v. Dickinson* [Mich.], 111 N. W. 1033; *Hertel v. Safety Folding Bed Co.* [Mich.], 112 N. W. 712; *Freebourn v. Chamberlain Med. Co.* [Iowa], 113 N. W. 918.)

Where there are two or more ways or methods by which a servant may perform his duties, and he voluntarily chooses the most hazardous, knowing it to be such, he does it at his own risk. (*Fritz v. Electric Light Co.,* 18 Utah 493; *Acme Coal Mng. Co. v. McIver* [Col.], 38 Pac. 596; *Kelsey v. C. & N. W. Ry. Co.* [Iowa], 76 N. W. 671; *Salem Bedford Stone Co. v. O'Brien* [Ind.], 40 N. E. 430; *Wilber v. Wisconsin Cent. Co.* [Wis.], 57 N. W. 356; *C. R. I. & P. R. Co. v. Cowles* [Neb.], 74 N. W. 579; *Union Pac. R. Co. v. Estes,* 16 Pac. 131.)

Where there is a comparatively safe and a more dangerous way known to a servant by means of which he may discharge

his duty, it is a want of ordinary care for him to select and use the more dangerous method. (*Gilbert v. B. C. R. & N. R. Co.,* 128 Fed. 529.)

Nor can it avail the plaintiff anything, if it were true, that the danger from the light wire was greater than he supposed it to be.

One who voluntarily and unnecessarily exposes himself to a known and great danger, and thereby directly contributes to his injury, cannot escape the fatal effect of his contributory negligence, because the negligence of the defendant which concurred to produce the injury, and of which he was ignorant, made the danger greater than he supposed it to be. (*Gilbert v. B. C. R. & N. R. Co.,* 128 Fed. 529, and cases cited; *Benson v. N. Y. C. R. Co.* [R. I.], 79 Atl. 79; *Lewis v. Simpson* [Wash.], 29 Pac. 207.)

The plaintiff was chargeable with the assumption of the risk though he may not have fully understood or appreciated the full extent of the danger or its details. (*Downey v. Sawyer* [Mass.], 32 N. E. 654; *Connelly v. Woolen Co.,* 163 Mass. 156, 39 N. E. 787; *Perkins v. Oxford Co.* [Me.], 71 At. 476.)

If a printed rule of notice or warning is placed in the possession of an employee, he is chargeable with knowledge of all therein contained, whether he reads it or not—he will not be permitted to blind his eyes to it and, if injured because of his failure to obey it, plead his ignorance, because he failed to read the rule. (*Brennan v. Mich. Cent. R. Co.* [Mich.], 53 N. W. 358; *Penn Co. v. Whitcomb* [Ind.], 12 N. E. 380; 1 Labatt on Master and Servant, sec. 227, p. 503; *Matchet v. Cincinnati, etc., Co.* [Ind.], 31 N. E. 792; *Lake Erie Co. v. Craig,* 80 Fed. 484; *Day v. Cleveland* [Ind.], 36 N. E. 854.)

### RESPONDENTS' POINTS.

It is true, as counsel for defendant claims, that this was a hazardous employment; but it is also true that the duty of the defendant Telephone Company to provide a safe place for the plaintiff and to warn him of any dangers in connec-

tion with such employment, was in proportion to the danger to be avoided.    The greater the hazard of the employment, the greater the duty of the master.    (*Myham v. Louisiana Elec. Co.,* 6 So. 799, 7 L. R. A. 172.)

Plaintiff, when he entered the employment of the defendant company, assumed the perils and risks ordinarily incident to such employment, but he did not assume the perils occasioned through the negligence of his employer.    (*Wright v. R. Co.,* 14 Utah 392; *Pool v. R. R. Co.,* 20 Utah 216; *Tuckett v. Steam & Hand Laundry,* 30 Utah 273; *R. R. Co. v. McDade,* 191 U. S. 64; *Wright v. Southern Pacific Co.,* 14 Utah 392; *Reddon v. Railway Co.,* 5 Utah 353; *Northern Pac. R. R. Co. v. Daniels,* 152 U. S. 688; *Hough v. Railway Co.,* 100 U. S. 113; *Wabash R. Co. v. McDaniels,* 107 U. S. 454; *Vandusen v. Letellier,* 73 Mich. 502; *R. & D. R. R. Co. v. Norment,* 84 Va. 176; *Ry. v. Archibald,* 170 U. S. 671; 18 Sup. Ct. 777, 42 L. Ed. 1188; *Merrill v. Railroad,* 29 Utah 264; *Leach v. Railroad,* 29 Utah 285; Section 4118, Thompson on Neg. [2d Ed.], vol. 4; *Tedford v. Los Angeles Elec. Co.,* 134 Cal. 76, 66 Pac. Rep. 76; *Consolidated Coal Co. v. Hanni,* 35 N. E. 165; *Lalor v. Coal Co.,* 52 Ill. 401; *Western Union Tel. Co. v. Mullen,* 58 N. J. Law 155; *Postal Tel. Cable Co. v. Likes,* 80 N. E. 141; *Coal Co. v. Wombacher,* 24 N. E. 627; Wood, Master & Servant, sec. 349.)

McCARTY, J.

Plaintiff brought this action against the Rocky Mountain Bell Telephone Company, hereinafter referred to as the Telephone Company, and the Utah Light & Railway Company, hereinafter referred to as the Utah Light Company, to recover damages for personal injuries alleged to have been sustained by plaintiff through the negligence of said companies, while he was at work for the Telephone Company on one of its lines of telephone poles and wires in Salt Lake City, Utah.    The Utah Light Company, by virtue of a certain contract which it had with the Telephone Company, strung and maintained one of its large feed wires, carrying

a heavy voltage used for lighting streets and residences, upon and along the line of telephone poles on which plaintiff was working at the time he was injured. Defendants, among other defenses set up, pleaded contributory negligence on the part of plaintiff. The cause was tried to a jury, who rendered a verdict in favor of plaintiff and against the Telephone Company for the sum of $15,000, and in favor of the Utah Light Company, "no cause of action." Judgment was entered on the verdict in favor of plaintiff for $15,000. The Telephone Company made a motion for a new trial, and on the hearing of the motion, the court made and entered an order that, unless plaintiff within thirty days should file a written consent to a reduction of the judgment from $15,000 to $10,000, the motion for a new trial would be granted. The plaintiff, within the time specified, filed with the clerk his written consent to the reduction of the judgment from $15,000 to $10,000, and the judgment, as thus modified, was allowed to stand. From the judgment, as modified, the Telephone Company prosecutes this appeal.

At the time plaintiff received the injuries complained of, he had been in the employ of the Telephone Company for nearly two years. When he commenced working for the company (May 12, 1905), he had no experience whatever in the telephone business, either as laborer or otherwise, and he so informed the company. While there is an apparent conflict in the evidence as to plaintiff's age, the great preponderance of the evidence tends to show that he was a little less than nineteen years old when he entered the service of the Telephone Company, and not quite twenty-one years of age when he received the injuries of which he complains. He was first employed as a helper in installing telephones in buildings. This work consisted in "just hanging them on the walls." He worked as a helper for a short time, and then he was put to work in the terminal room. Plaintiff's duty while working in the terminal room was to test the different lines of wires; that is, he would answer the calls of the linemen who were sent out by the "trouble" department to repair the wires, and with a voltmeter test the lines

undergoing repair. His duties while working in the terminal room were similar to those of an ordinary operator. The wires he was called upon to test carried but a small voltage, and were not dangerous to human life or safety. In the latter part of the year 1906 plaintiff left the terminal room to do outside work, and received a release from the department in which he had theretofore been working. After he left the terminal room he assisted for a short time in the work on cables underneath the ground, which was carried on through manholes. He was then put to work as helper under a Mr. Doolan, who was cable splicer acting under a Mr. Ruttle, foreman of that department. He had had no experience in this line of work, and up to this time he had done no work nor performed any service for the company in which it was necessary for him to climb poles. His work under Doolan consisted merely of pushing around a two-wheeled hand cart, in which was a small furnace to melt solder, and in which the tools used by Doolan in the business were kept and moved from place to place as the work progressed, and in attending to various other duties, such as keeping the furnace in the cart burning, and passing tools to Doolan while at work on the poles. While working in this department, plaintiff at Doolan's request, climbed a few poles for the purpose of testing the telephone wires. These poles upon which he worked were poles upon which there were no electric light wires or feed wires. When he had been at work in this department about four or five weeks, he, at Doolan's request, climbed one of the Telephone Company's poles situated at the injunction of Center Street, First North and Main Streets for the purpose of testing some of the telephone wires strung thereon. This was a thirty-five foot pole, with a cable box fastened to the south side of it about eight or nine feet from the top. Numerous telephone wires were connected with this cable box, and tests were made from it. The box was about three feet in length and about one foot in width, and the bottom of it was about twenty-six or twenty-seven feet from the ground. There was also a platform or seat attached to the pole about eighteen

inches below the box, and directly in front of it. From the face of the pole to the inside edge of the platform there was a space of about sixteen inches, and the space between the iron braces, or arms supporting the platform was about eleven inches.

It is contended by counsel for appellant that the space between the inside of the platform and the pole, and between the two braces upon which strips of wood were placed to construct the platform, was ten by sixteen inches. In other words, it is contended on behalf of appellant that plaintiff, while sitting on the platform, "had a space of ten by sixteen inches, with the box in no way interfering, in which to place his feet and legs." On the other hand, respondent contends that the space did not exceed eleven by eleven inches. We think it is immaterial as to which side is correct on this point, as the difference in the two estimates is not sufficient, when considered in connection with all the other facts and circumstances disclosed by the record, to affect the result of the case. There were two arms, each of which was about seven feet in length, on the south side of the pole beneath the platform. These extended east and west. One of the arms was eleven or twelve inches immediately below the platform, and had five wires strung to it, two on the west side of the pole, and three on the east side. The nearest wire to the pole on the west side was about seven or eight inches west of the platform. This wire was supported by an insulator attached to the arm, which raised the wire about three inches above the arm, so that the wire was about nine or ten inches below and seven or eight inches west of the platform. It was a high-voltage wire and carried forty-four hundred volts, and was what is known as a primary or feed wire. It belonged to the Utah Light Company. This company had another primary or feed wire strung to this arm of the pole, but it was about three feet east of the platform, and practically out of reach of a person sitting on the platform. The Utah Light Company also had three other wires strung to the arm of the pole, each of which carried from forty-five to seventy volts. The other arm of the

pole was about six or seven inches below the arm first mentioned. On this lower arm there were two wires, making in all seven wires that were insulated and attached to the two arms. These electric light wires were all of about the same size, and were placed upon insulators of about the same size and appearance, and all carried currents of electricity. The only way one could tell the primary or feed wires from the balance of the electric light wires strung to the pole in question was by tracing them from a transformer and there was no transformer on the pole to which the platform mentioned was attached. Doolan, the cable splicer under whom plaintiff worked, testified that: "Even with his [Doolan's] experience he could not, without some instructions or notice, tell which of the Utah Light Company's wires carried high voltage." These electric light wires were weather-worn, and the insulation on the primary or feed wire nearest the pole on the west was worn and defective. Besides these electric light wires there were two large cables running down the pole on either side of the cable box. One of the cables came down the pole from above, and entered the center of the cable box near the bottom of the lower edge, and took up some of the space between the platform and the box.

Under these conditions Doolan, on January 26, 1907, at about 4:30 o'clock p. m., sent the plaintiff up the pole in question to make certain tests that had been ordered by the superintendent of the department in which they were working. The evidence shows that "there was a heavy snow falling—very wet snow—and it was rather a dark day." Plaintiff climbed up the pole, seated himself on the platform with his legs astride of it, that is, his legs extended downward from the outer edges of the platform. While in this position he unlocked the door of the cable box, and, by the use of a transmitter and receiver of a small telephone set which he carried with him, made connection through the box with the home office, and while waiting for a response, and while holding in his hand the receiver of this telephone set, his left leg came in contact with the current of electricity passing

along and through the primary or feed wire nearest the pole on the west. Just prior to the injury he looked down at the wire, and his leg was, so he testified, about four inches from the wire. Plaintiff was rendered unconscious by the contact. His left hand was so severely burned that he had to have it amputated. His left arm was burned between the elbow and shoulder, and as a result it became very much shrunken. His left leg below the knee was burned into the bone, and a portion of the bone was taken out. He was in the hospital about three and one-half months, and suffered intense pain, and at the time of the trial (March, 1908), which took place more than a year after he was injured, he was still suffering and under the doctor's care. Mr. Doolan, prior to the accident, had been advised of the dangerous condition of this feed wire, and warned "to look out for the wire, as it carried four thousand" volts but he did not advise nor warn plaintiff of the wire and the heavy current of electricity which it carried, and plaintiff had no information respecting the dangers of this pole, except the general knowledge he had acquired that electric light wires carrying heavy currents of electricity are dangerous.

At the conclusion of the plaintiff's evidence in chief, the Telephone Company moved the court for a nonsuit on the following grounds: (1) That plaintiff had assumed the risks and dangers to which he was exposed; (2) that he was guilty of negligence which proximately contributed to the accident; and (3) that there was a fatal variance between the allegations and the proof adduced. The court overruled the motion. When the evidence was all in, and both sides had rested, the Telephone Company asked for a directed verdict of "no cause of action" in its favor. The refusal of the court to direct a verdict as requested, and the overruling of the motion for a nonsuit, are assigned as errors. These assignments involve the only questions presented on this appeal that contain merit sufficient to entitle them to consideration.

We shall first consider the question of the alleged variance between the allegations of the complaint and the evidence.

The following is the allegation of the complaint covered by the assignment of error: "That at said time, without fault on plaintiff's part, the left leg of this plaintiff touched against said feed wire at said point of defective insulation; that by reason of said defective insulation of said feed wire, an electric current of about four thousand four hundred volts passed from said feed wire through the body and left arm and left leg of this plaintiff." At the trial plaintiff introduced evidence tending to show that electricity will jump or arc a distance of three or four inches from the wire, and that, on the occasion referred to, plaintiff received his first shock before any part of his body came in actual contact with the wire. This evidence, appellant insists, was at variance with the foregoing allegation of the complaint. We do not think the contention sound. But, even if the evidence were construed to be at variance with the allegation of the complaint, the variance would be immaterial. One of the grounds upon which plaintiff based his right to recover was the alleged defective insulation of the primary or feed wire mentioned. Of this appellant had notice, because it is alleged "that the insulation of said feed wire, at and near said pole, had become, and was during all the times herein mentioned, partially worn and defective, and that by reason thereof, at all said times, the said current of electricity passing through said feed wire could and would pass to bodies of persons coming in contact with said feed wire at said point." And it is further alleged that appellant "had knowledge during all said times of the said defective condition of the insulation of said feed wire; . . . that during all said times said defendant negligently and carelessly permitted the said feed wire to remain attached to said pole, as aforesaid, and to remain with said defective insulation." It is also alleged that appellant "negligently and carelessly failed and neglected to . . . warn plaintiff of the danger to himself in coming in contact with said feed wire at said place of defective insulation." Under these allegations appellant could not have been misled by proof that plaintiff's body

received the current of electricity carried by the feed wire before his leg came in actual physical contact with the wire at the point of the alleged defective insulation. In fact no claim is made that appellant was misled or prejudiced by this evidence. Counsel for appellant simply assert that there was a variance, and that "plaintiff was permitted to recover upon a cause of action entirely different from that set up in the complaint." As we have pointed out, one of the acts of negligence charged in the complaint was the maintenance by appellant of a defective feed wire heavily charged with electricity upon one of its poles and in close proximity to where plaintiff, under the direction of appellant, was at work when he received the injuries complained of. That the evidence complained of tended to prove this allegation—that is, the alleged defective insulation of the feed wire—and also the allegation that the accident complained of was due to the maintenance of this feed wire in its alleged defective condition, is too plain to admit of discussion. Or, to state it negatively, the evidence objected to in no sense tended to prove an act or omission of appellant not alleged in the complaint. But assuming, for the sake of argument, that there was a variance, it was, as we have stated, immaterial, because the record shows that appellant could not have been misled or prejudiced by it.

Section 3001, Comp. Laws 1907, provides: "No variance between the allegations in a pleading and the proof is to be deemed material, unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits." In the case of *Mining Co. v. Mining Co.,* 5 Utah 3, 11 Pac. 515, this court, in harmony with the foregoing provisions of the statute, held that "a variance between the allegations and the evidence, which ought not to mislead the appellant to its prejudice, is no ground for reversal." (*Culmer v. Clift,* 14 Utah 286, 47 Pac. 85; *Holman v. Pleasant Grove City,* 8 Utah 78, 30 Pac. 72; 3 Bates, Pl. and Pr., 2278-2282, and cases cited; 8 Words and Phrases, 7285.) Furthermore, it was the duty of appellant to furnish respondent with a          3

reasonably safe place to perform the work required of him under his contract of employment, and this evidence tended to show that appellant was negligent in this respect.   When respondent first entered the service of appellant he was furnished with a copy of appellant's "Notice and Rules" to the employees.   The notice provides, in part as follows:

"Linemen . . . troublemen, splicers and other employees of this company having occasion to . . . work with or about telephone apparatus generally, are hereby warned of such dangers as surround thir employment; especially the fact that . . . all wires ('guy wires included), whether on the company's poles or adjacent thereto, may be, or may become charged with heavy currents of electricity dangerous to life, and that the . . . wires, platforms, brackets and other fixtures on or about poles, and hitches on buildings, because of their character and exposed positions, are liable to become . . . dangerous, unknown to the management. Employees are therefore instructed to inspect each pole before climbing or working on or about the same, and to carefully test the safety and security of the wires and fixtures before working thereon, . . . and to note that all trolley wires and their feed wires, and electric light and power wires, including all guy wires, whether insulated or not, are liable to be charged with heavy currents of electricity and may be dangerous from contact or connection, whether direct or indirect. All employees are forbidden to . . . work in unsafe places, the usual risks of their employment of course excepted."

It is strenuously urged that, respondent having thus been warned of the danger of coming in contact with electric light wires, he is, as a matter of law, precluded from recovering in this action.   When respondent went to work for appellant on its lines of telephone poles and wires,     **4.** he assumed the ordinary risks and hazards that ordinarily arise from and are incident to this kind of employment, and such dangers as are obvious and apparent.   This assumption of risk, however, did not include the extra risks. and hazards that might arise from the failure of appellant to use ordinary and reasonable care to keep the wires, carrying heavy currents of electricity strung upon its poles, properly insulated at and in the vicinity of where respondent was at work, unless these extra dangers were pointed.

out to him. Under well-settled principles of law the servant never assumes the risks and dangers incident to and growing out of the master's negligence, unless such dangers are obvious or have been pointed out to the servant, and he is thereby advised of their existence. No claim is made that respondent was advised, or that he had any knowledge of the defective condition of the insulation of the feed wire; but, on the contrary, the record affirmatively shows that he did not know of this defect and the unusual dangers arising therefrom. Nor was this extra danger obvious and apparent. Nor is appellant necessarily exonerated from liability by virtue of the clause in its "Notice and Rules" that "electric light and power wires . . . whether insulated or not . . . may be dangerous." The fact that the feed wire in question was insulated was, in effect, notice to the respondent that he might rely upon whatever safety and protection the insulation of wires furnishes and secures to the linemen and others working on or about the poles on which wires of this kind are strung. Therefore the contention that respondent as a matter of law, assumed the risks and hazards to which he was exposed, including the extra dangers which arose from the imperfect insulation of the feed wire, cannot be upheld.

In the case of *Postal Telegraph-Cable Co. v. Likes,* 225 Ill. 249, 80 N. E. 136, the plaintiff, who was an experienced lineman, was injured while climbing a pole belonging to an electric railway company, by coming in contact with a high voltage wire which was attached to the pole, and a judgment in favor of plaintiff was upheld.

In the course of the opinion the court says:

"Although the duty of inspection of wires and poles upon and around which a lineman is working may ordinarily be upon such lineman, where his knowledge or previous experience is such that he may know and appreciate the danger to which he is exposed, yet where the master knows of peculiar and unusual dangers which a lineman will encounter in the performance of certain work, or has reason to anticipate the presence of such danger, and the danger is of such a nature that the servant, from lack of knowledge, may

not appreciate or understand it, the master owes the servant the duty of warning him of such danger. (4 Thompson's Commentaries on the Law of Negligence, section 4118.) The master's duty in each case must necessarily depend upon the ability of the servant to recognize and appreciate the danger which he will encounter in the performance of his work, and the master cannot act upon the assumption that the servant, being a man of average intelligence, will recognize and appreciate latent and hidden dangers which cannot be discovered by ordinary inspection, and of which the servant has no knowledge."

It is also contended on behalf of appellant that respondent could have avoided coming in contact with the feed wire by placing his feet and legs between the braces and letting them hang down between the inner edge of the platform and the pole, instead of sitting astride the platform and permitting his feet and legs to hang over the outer edges of the seat, and that therefore respondent, having adopted "the easy and dangerous way rather than a way that was more troublesome but safe, or safer," in which to perform his work, he cannot recover. The evidence, however, without conflict, shows that it was the custom of the experienced linemen in appellant's employ to sit astride of these platforms when making tests from cable boxes situated similarly to the one in question. Mr. Sheeley, an experienced lineman, was called as a witness, and testified on this point as follows: "There was a custom during all the time that I worked for the company, and ever since, of employees standing and sitting on the cable platforms with both legs over— one leg over and one leg here. They adopted the position on the platform to suit the circumstances. I don't know that I ever sat with both legs between the brackets, or ever saw anybody sit that way. There was always one leg outside that I saw." Upon this point the court instructed the jury:

"If you find from a preponderance of the evidence that plaintiff, in performing his work upon the pole where he was working when he received his injury, adopted the most dangerous method of two or more ways of performing his labor, and that a reasonably

safe way was open and obvious to him, and that he selected the more dangerous way with knowledge, actual or constructive, of the fact that it was more dangerous, and that a reasonably prudent person of his age and experience, in the exercise of due care, would not have adopted such method of working upon said pole, your verdict must be in favor of the defendant, no cause of action."

The question as to whether respondent, in performing his work, adopted the most dangerous method of two or more ways of performing his work, being one of fact, and the court having submitted it to the jury, and properly so, and the jury having found that issue in favor of respondent, we are concluded by the finding.

We find no error in the record. The judgment is therefore affirmed, with costs to respondent.

STRAUP, C. J., and FRICK, J., concur.

### ON PETITION FOR REHEARING.

McCARTY, J.

Counsel for appellant have filed a petition for a rehearing. The ground upon which they ask for a reargument is that certain questions raised and presented by their assignment of errors are not discussed in the opinion filed in the case. In connection with the questions discussed in the opinion the matters now referred to by counsel were by us given due attention, and, as stated in the opinion, we did not regard them as being of "sufficient merit to entitle them to consideration." To state our position more clearly, we did not deem them of sufficient importance to warrant discussion in the opinion. We have again carefully reviewed the entire case, including the questions discussed by counsel in the petition, and are still of the opinion that the record contains no error prejudicial to the rights of appellant, and that the judgment ought to be affirmed. We have decided, however, in view of the elaborate brief filed in support of the petition, and the earnestness with which counsel have argued the propositions therein contained, to briefly review

and discuss the questions raised by the assignment of errors, and which we omitted, but not inadvertently, to discuss in the opinion.

One of the issues in the case was whether plaintiff had notice of the dangers to which he was exposed. The complaint alleged that he had no notice, and was not warned of the defective insulation of the wire with which plaintiff came in contact. The answer denied this allegation, and affirmatively alleged that plaintiff had notice and was warned of all dangers to which he was exposed while at work as a lineman for defendant. In support of this allegation of the answer defendant introduced in evidence a copy of its "Notice and Rules" to its employees, the material parts of which are incorporated in the opinion filed in the case. Plaintiff was provided with a copy of the notice and rules when he first entered the service of defendant. On cross-examination he was interrogated by counsel for defendant respecting his knowledge of the contents of the notice. His testimony on such cross-examination was, in part, as follows: "Q. Therefore you took it and read it and filled it in and signed your name? A. I don't believe I ever read it. I don't know one word that is in it. Q. But you are not positive you didn't read it, are you? A. Well, I wouldn't swear to it, but I am almost sure I didn't read it. Q. But you would not swear to it? A. No, sir. Q. How did you know what to write if you didn't read it? A. I believe I read this part from here down. Q. He gave it to you, and then you read what you saw fit, is that right? A. No. He told me to fill in the vacancies. I didn't really understand what it was to sign a paper at that time." In view of such testimony the defendant requested the court to charge the jury as follows:

"The jury is instructed that the plaintiff was in duty bound to read the instructions and warning which were delivered to him by the defendant Telephone Company when he entered its employment, and he is chargeable with knowledge of all that is contained therein so far as it pertains to this action, even though he may not have read it."

The request was refused. No claim was made at the trial, by the pleadings or otherwise, that plaintiff was not chargeable with knowledge of the contents of the writing signed by him. The contention made by plaintiff in·that regard was that the contents of the writing did not constitute notice or warning of the particular alleged defect and dangers which caused the injury, or at least were not conclusive on the subject. The document was admitted in evidence as a writing knowingly and freely executed by plaintiff, and as charging him with knowledge of everything therein contained. No question or controversy having arisen as to whether he signed the writing with knowledge of its contents, or as to whether he was bound by it because he did not read it before he signed it, as testified to by him, no error was committed in refusing the request. Furthermore, the court charged the jury as follows:

"You are instructed that the paper introduced in evidence by the said defendant Rocky Mountain Bell Telephone Company, being its Exhibit No. 2, is admitted only for the purpose of showing that plaintiff, at the time he signed the same, had notice and warning of the matters therein set out, and it can in no way be considered by you as a contract releasing the said Rocky Mountain Bell Telephone Company from any act of negligence on its part, if you so find, under the instructions heretofore given, by which the plaintiff was injured, if you so find. Such a release would be contrary to public policy and void."

The court here, in effect, charged the jury that plaintiff, when he signed the writing,. had notice and warning of the matters therein set out, and that the jury should consider it for that purpose. The defendant had the benefit of the writing in evidence, and of the charge of the court that the jury should consider it as showing that the plaintiff had notice and warning of the matters therein set out without re-· striction or qualification, and regardless of the circumstances under which it was signed. The court, in effect, stated to the jury all that was contained in the request. In the request it was stated that the plaintiff was charged with knowledge of the contents of the writing even though he may not have read it. In the instruction given the court told the jury

that the writing was in evidence, and should be considered by them as showing that plaintiff had notice and warning of the matters therein set out. The court also instructed the jury that: "Constructive knowledge, as used in instruction number 18, would mean where he had been given reasonable notice; and, if you find from the evidence that he had been given reasonable notice, so that a reasonably prudent person would have known it, then he is deemed to have constructive notice of it." It will therefore be seen that the instructions given were in harmony with the defendant's theory of the case, and were even more favorable to it than the instruction asked for.

While it is a well-recognized principle of law that parties to an action tried to a jury are entitled to have the jury instructed on the law applicable to the case, and it is the duty of the court, when seasonably requested in writing by either party, to instruct the jury upon any issue in the case, yet the rule is equally well established that the court is not bound to follow the exact language of the request. If the court in its general charge to the jury clearly and correctly states the law applicable to the points and issues covered by the requests, it is sufficient. (11 Ency. Pl. and Pr. 247; *Spiking v. Con. Ry. & P. Co.*, 33 Utah 313, 93 Pac. 838; *Hickey v. Railroad*, 29 Utah 394, 82 Pac. 29; 1 Spelling, New Tr. and App., 305.

This rule is so well established that we deem further citation of authorities unnecessary.

In conclusion we remark that the instructions given in the case, when considered as a whole, were as favorable to the defendant as the facts in the case warrant.

For the reasons stated the petition for a rehearing is denied.

STRAUP, C. J., and FRICK, J., concur.